
# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 16, 2016

## STATE OF TENNESSEE v. NATHAN BERNARD LALONE

**Appeal from the Criminal Court for Hamilton County**
**No. 284472    Rebecca J. Stern, Judge[1]**

_____

## No. E2016-00439-CCA-R3-CD

_____

Defendant, Nathan Bernard Lalone, was convicted of one count of first degree murder and one count of attempted first degree murder. He raises the following issues on appeal: (1) the trial court erred in denying a motion to suppress his statement to police because he had invoked his right to remain silent; (2) the trial court erred in denying a motion for leave to file an interlocutory appeal of the suppression issue; (3) the trial court erred in denying a motion for judgment of acquittal and motion for new trial because the accomplice testimony was not sufficiently corroborated; (4) the trial court erred in allowing the State to play a videotaped interview of a witness as a prior inconsistent statement; and (5) the evidence is insufficient to support his convictions. Upon our review of the record and applicable authorities, we conclude that the trial court erred in denying Defendant's motion to suppress and that the error was not harmless. Furthermore, we conclude that the trial court committed plain error in admitting a witness's recorded statement into evidence without following the Rules of Evidence with regard to prior inconsistent statements. For these two reasons, we reverse Defendant's convictions and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Case Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

---

[1] Judge Rebecca J. Stern presided over the pre-trial motion hearings and trial of this case. After her retirement, Judge Jon Kerry Blackwood, sitting by designation, presided over several changes in counsel and granted a late-filed motion for new trial and delayed appeal. Judge Thomas C. Greenholtz was appointed as successor judge, presided over the motion for new trial hearing, and filed a detailed order denying said motion.

Amanda B. Dunn (on appeal); Kevin L. Loper and Jeffrey S. Schaarschmidt (at trial), Chattanooga, Tennessee, for the appellant, Nathan Bernard Lalone.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Neal Pinkston, District Attorney General; and Brian Finlay and Kristin Spires, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Factual and Procedural History*

On the night of November 16, 2011, Christian Sosa and his girlfriend, Meghan Bennett, were shot at the tennis courts in Apison, Tennessee, a suburb of Chattanooga. Mr. Sosa died as a result of multiple gunshot wounds. In July of 2012, Defendant was indicted for one count of first degree murder and one count of attempted first degree murder.

### *I. Motion to Suppress Hearing*

On May 5, 2014, Defendant filed a motion to suppress a statement he gave to police on November 17, 2011, on the ground that his statement was obtained after he invoked his right to remain silent.[2] At the hearing, no witnesses were called to testify on the suppression matter. The video-recorded interrogation of Defendant was played for the trial court and was entered as an exhibit to the hearing. Defendant did not contest whether he was subject to a custodial interrogation and conceded that he was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and that he initially waived those rights. The parties agreed that anything Defendant said prior to being advised of his rights would be excluded. However, Defendant argued that he later invoked his right to remain silent and that any statements he made thereafter should also be suppressed.

In the video, a detective[3] entered the interrogation room, told Defendant that "the case is put together," and encouraged Defendant to admit that he "messed up." Defendant initially believed that he was being questioned about drugs and was confused about the detective's reference to a gun. After being read and signing his *Miranda* rights, Defendant denied any involvement in anything that happened to Mr. Sosa. Defendant stated that Tyler Conrad had a problem with Mr. Sosa over stolen guns and drugs.

---

[2] Defendant also filed a "Motion for Hearing to Determine Admissibility of Testimony Regarding 'Mobile Phone Tracking,'" which was argued at the same hearing as his motion to suppress. The trial court's ruling on that motion is not before this Court.

[3] This detective did not testify and was identified at trial only as Detective Daniel.

Defendant admitted also having a "beef" with Mr. Sosa over a gun that had been stolen a couple of months prior. Defendant stated that Mr. Conrad and Defendant's roommate, Blake Adams, had recently been talking about "getting" Mr. Sosa and "were really getting hot about that stuff." Defendant denied owning a gun and stated that Mr. Conrad had a "40 Glock." Defendant stated that he was with other people during the past couple of days who could verify his whereabouts. Defendant stated, "That's really all I can tell you about that," and that he felt "like a f---ing snitch" for talking about it.

The detective asked Defendant, "Do you really think you're fooling anybody?" Defendant told the detective to talk to the people he had been with over the past three days "since I didn't do anything." The detective responded, "Yeah, you did." Defendant continued to deny doing anything, and the detective asked "Do you think you're here by accident?" Defendant stated that "obviously something went down" and that Mr. Conrad and Mr. Adams were "trying to put it on me because they're best friends." Defendant explained that they probably decided to put the blame on Defendant because they knew he also had problems with Mr. Sosa, that he had "a rap sheet," and that he was aggressive. Defendant said that if Mr. Conrad and Mr. Adams were saying he did it, "there is nothing else I can do" except get witnesses to prove he did not do it.

The detective said that he was there to "hear [Defendant's] side of [the story]," and Defendant responded, "I just told you my side. It's not even my side, it's just a story . . . that's the best of my knowledge that I can tell you of any knowledge that I can have at all of anything that would have to do with anything like that." After reiterating that Mr. Conrad had a gun, had a problem with Mr. Sosa, and had been "talking about doing stuff" in the past couple of days, Defendant stated that he was "telling you everything I know to the best of my knowledge. So I don't know what else you want me to tell you, but you keep trying to talk to me like I'm a fool, like I'm just trying to play you, like I'm trying to play games." The detective responded, "Yeah, I am." Defendant said, "OK then, well, then I ain't got nothing else to say 'cause I done told you whatever I know." The detective responded, "Take you a rest, I'll be back in a little while," and left the room. Just over nine minutes later, a second detective[4] entered the interrogation room and, without giving new *Miranda* warnings, resumed questioning Defendant by asking him to "establish where you were yesterday."[5]

After the video was played, the trial court stated that it did not "hear him say I don't want to talk about it" and that it may have "missed that." The last minute or so of Defendant's conversation with the first detective was played again. As defense counsel

---

[4] This detective was later identified at trial as Detective James Gienapp.

[5] It appears that only this initial portion of the video was played for the trial court. Defendant spoke to the second detective for a total of 72 minutes over the course of approximately two hours. The substance of that statement will be summarized below.

was presenting his argument, the trial court stated that it did not interpret Defendant's statement "I ain't got nothing else to say" as an invocation of the right to remain silent. Instead, the trial court interpreted the statement to mean "[t]here's nothing more I can tell you about it" or "that's my story and I'm sticking to it." Defense counsel and the trial court disagreed about what the first detective was thinking when he said "take a rest" and left the room.[6] The trial court stated that it was concerned about the first detective leaving "then another officer tag-team comes in," but that it did not "hear a clear invocation of [Defendant's] rights." The trial court agreed to take the matter under advisement and read the case law submitted by the parties but stated that "the way I'm reading it right now" was that Defendant did not invoke his right to remain silent.

According to a minute entry, the trial court denied the motion to suppress on May, 19, 2014; there is no written order in the record detailing the trial court's findings of fact and conclusions of law. Defendant filed a second motion to suppress his statement arguing that Defendant did not acknowledge that he was waiving his rights when he signed the rights waiver form. On June 2, 2014, the trial court overruled the second motion to suppress as well as Defendant's request for an interlocutory appeal of the first motion to suppress.[7] The case proceeded to trial on June 3, 2014.

## II. Trial

Around 10:00 p.m. on November 16, 2011, Meghan Bennett and her boyfriend, Christian Sosa, drove to the tennis courts in Apison to meet Tyler Conrad. Ms. Bennett backed her car into a parking space. The next thing she knew, Mr. Sosa was telling her to leave and "bullets start[ed] flying in [her] car." Ms. Bennett ducked and was eventually able to drive out of the parking lot towards her parents' house.

At 10:26 p.m., Hamilton County 911 received a report that nine gunshots had been fired at the county park and that a small dark-colored Honda fled the parking lot with its lights off. At 10:30 p.m., William Bennett, Ms. Bennett's father, called 911 to report that his daughter and her boyfriend had been shot. Mr. Bennett reported that his daughter had been shot in the arm and that her boyfriend had sustained several gunshot wounds and was deceased. Ms. Bennett can be heard in the background identifying the shooter as Mr. Conrad because he was the person who had arranged the meeting at the tennis courts.

When Ms. Bennett testified at trial, she described the shooter as a "bigger person" dressed in black and wearing a black mask; she expressed disbelief that it was Defendant.

---

[6] The prosecutor stated that the detective had not been called to testify at the agreement of the parties but that he could be made available, which the trial court determined was not necessary.

[7] The trial court's ruling on the second motion to suppress is not before this Court on appeal. The denial of an interlocutory appeal will be discussed further below.

Ms. Bennett was asked to identify individuals in still photographs taken from a Walmart security video. She identified Mr. Conrad as well as Blake Adams in two photographs. Mr. Adams is shown wearing a white shirt and khaki shorts, and Mr. Conrad is shown wearing a black t-shirt and dark-colored jeans. In one photograph, Mr. Conrad, Mr. Adams, and a third person later identified as Sabrina Lovett are seen entering the store at 10:35 p.m. In the other photograph, the group is seen leaving the store at 10:50 p.m. In a third photograph, a car appears to be arriving in the parking lot around 10:48 p.m. Ms. Bennett identified the car as belonging to Defendant. Ms. Bennett also identified Defendant in two photographs showing him inside the store around 10:52 p.m. Defendant is shown wearing all black and talking on a cell phone.

On cross-examination, Ms. Bennett testified that Defendant and Mr. Sosa had a prior disagreement that seemed to have been resolved. She had known Defendant for about six or seven months and considered him one of her good friends. She had known Mr. Conrad and Mr. Adams since high school and knew that they used "[w]hatever [drugs] they could get their hands on." She stated that Mr. Sosa and Mr. Adams had a previous physical altercation and that Mr. Adams had anger problems. She agreed that Defendant was a "bigger guy" known as "Big Nate" while Mr. Conrad was of average build. Ms. Bennett agreed that during the 911 call and later while she was talking to the police, she identified Mr. Conrad as the shooter because he was the one they were going to meet. She never mentioned Defendant as a suspect because she did not believe that he could "have done that to [her]."

Detectives from the Hamilton County Sheriff's Office recovered a total of eleven spent .40 caliber shell casings from in and around the parking lot of the tennis courts. Photographs of Ms. Bennett's red Honda were entered into evidence showing approximately eleven bullet holes in the front passenger side door and window. Two projectiles were also found in the vehicle. Defendant's two cars were searched for glass fragments to compare to the Honda's broken window, but none were found.

While searching the area around the tennis courts for a gun, Captain Lynn Triplett and another officer found clothes near a fence line along a gravel road approximately three to four hundred feet away. Among the clothes was a pair of pants with Defendant's driver's license in the pocket. On cross-examination, Captain Triplett agreed that the license looked weathered. Captain Triplett could not remember the exact date of the search or whether they were searching the location at the suggestion of Mr. Conrad.

Agents from the Tennessee Bureau of Investigation ("TBI") examined clothing belonging to Defendant for the presence of blood, gunshot residue, and glass fragments, but nothing was found. Swabs from Defendant's vehicles also tested negative for

- 5 -

gunshot residue. Clothing belonging to Mr. Conrad[8] and Mr. Adams were also tested for the presence of blood, but an officer from the Hamilton County Sheriff's Office told the TBI agents not to test them for gunshot residue or glass fragments. The medical examiner testified that Mr. Sosa sustained approximately ten gunshot wounds to the arms and torso, but none to his head. The medical examiner also confirmed that, prior to trial, Mr. Conrad died as the result of an accidental overdose of fentanyl, a strong pain killer.

Detective James Gienapp testified that he was involved in the interrogation of Defendant the day after the shooting. Detective Gienapp explained that another detective "attempted to interview" Defendant but that it "didn't really go anywhere." Detective Gienapp was asked to continue the interrogation because he was closer in age to Defendant. The recording of Defendant's statement was played for the jury and entered into evidence.[9] In the statement, Defendant stated that he believed Mr. Conrad was responsible because Mr. Conrad had been talking about "doing in Chris," though Defendant thought he was joking. Defendant initially denied seeing Mr. Adams and Mr. Conrad that evening but then admitted that he saw them at Walmart and rode with them back to the apartment, leaving his car in the parking lot. Defendant denied having a phone when he went to Walmart. Defendant admitted that he had a "beef" with Mr. Sosa because Mr. Sosa had taken Defendant's gun and lied about it, but Defendant said that they eventually "shook and made up." Defendant denied shooting Mr. Sosa. After being urged to tell the truth, Defendant admitted that he and Mr. Conrad talked about being angry at Mr. Sosa and that Defendant wanted to "beat his ass." Defendant said that Mr. Conrad called to set up the meeting with Mr. Sosa and that Defendant tried to talk Mr. Conrad out of killing him. Defendant said that Mr. Conrad shot Mr. Sosa, firing "his whole clip at the car." When Defendant saw Mr. Conrad again, Mr. Conrad said that "it was done, man," but that he was not sure if he killed Ms. Bennett because he heard "the car take off" as he fled the scene. Defendant said that Mr. Conrad told him that Ms. Bennett was crying for her life and that she used Mr. Sosa's body as a shield. Defendant denied being present when Mr. Conrad shot Mr. Sosa. When they later met at Walmart, Defendant said that Mr. Conrad was acting like nothing happened and did not have a gun on him. Defendant eventually admitted that he was present during the planning of the shooting. Defendant admitted that he did not like Mr. Sosa and wanted to beat him up but insisted that he did not want to kill Mr. Sosa over a stolen gun.

In preparation for trial, Detective Gienapp was asked to drive between the tennis courts in Apison and the Walmart on Gunbarrel Road in May of 2014. Detective

---

[8] We note that the TBI reports indicate that a blue and white checkered shirt from Mr. Conrad was submitted for testing but that the Walmart footage shows Mr. Conrad wearing a black tee shirt on the night of the shooting.

[9] Upon our review of the video-recording that was entered into evidence and played for the jury, we note that the audio and the video seem to be misaligned by several seconds.

Gienapp drove between the locations a total of four times on a Saturday night between 10:00 and 11:15 p.m., observing all traffic signals and not passing other drivers. Detective Gienapp was able to drive from Walmart to the tennis courts at speeds of less than 50 miles per hour in 19 minutes and 40 seconds. He then drove back to Walmart at speeds over 50 miles per hour in 14 minutes and 30 seconds. He then completed a second round trip at speeds over 50 miles per hour, going from Walmart to the tennis courts in 15 minutes and 40 seconds and back in 12 minutes and 26 seconds. On cross-examination, Detective Gienapp admitted that he encountered some light traffic during his test and that he did not know if the traffic was heavier on a Saturday night than on a Wednesday night. Detective Gienapp stated that he took the same route suggested by his GPS each time and admitted that he did not know of any short cuts. Detective Gienapp also admitted that he drove at speeds only 5 to 10 miles per hour over the posted speed limit.

Mr. Adams testified for the State at trial. He stated that Mr. Conrad, who had passed away prior to trial, was his best friend and that they were nearly inseparable. Mr. Adams was also friends with both of the victims as well as Ms. Lovett, who lived in his apartment complex. Mr. Adams also socialized with Defendant, though they were not as close as Mr. Adams and Mr. Conrad. Mr. Adams admitted that both he and Mr. Conrad used drugs. Mr. Adams had recently picked Mr. Conrad up from a rehabilitation center in Alabama because Mr. Conrad "was doing so many drugs down there" that were worse than the drugs available at Mr. Adams's residence.

Mr. Adams admitted that he could not remember most of the events of November 16, 2011, because of his overuse of a prescription anti-anxiety medication on the date in question. Mr. Adams stated several times during his testimony that his memory was "blurry" and that he "might be mistaken" about what he remembered happening. Mr. Adams could remember going to Walmart and checking out, though he was confused about what he had purchased. Mr. Adams was "pretty sure" that he went to Walmart with Ms. Lovett and Mr. Conrad, that they drove together in his gold Honda Accord, and that it was dark outside when they arrived. Defendant was not with them at that time. Mr. Adams recalled speaking to Defendant on the phone and remembered "only one thing he said out of the whole conversation," which was "I hit him in the dome." Mr. Adams explained that "dome" means head and that he "guess[ed]" that Defendant was referring to Mr. Sosa, though he did not know that at the time. When asked directly, Mr. Adams denied that either he or Mr. Conrad killed Mr. Sosa and shot Ms. Bennett. Mr. Adams stated that he and Mr. Conrad were together the entire night.

On cross-examination, Mr. Adams recalled being taken into custody around 3:00 a.m. on November 17, 2011, and being questioned by the police for a long period of time, though he could not remember many specific details about the questioning. Defense counsel read portions of the transcript of Mr. Adams's statement in an attempt to refresh

his recollection. The transcript indicated that one of the first things Mr. Adams told the detective interviewing him was that he was at Walmart the night of the shooting and that he had a receipt to corroborate his alibi. Mr. Adams did not recall telling the detective that Ms. Lovett also had a receipt from Walmart but explained that he was probably being sarcastic when he said that. Mr. Adams testified that he was nowhere near the tennis courts that day and that he "was always in sight of something." Mr. Adams did not recall telling the officer that he went to the tennis courts after being told by a friend that something was happening over there. Mr. Adams explained that he was scared during the interrogation, that it was "an extreme terrible adrenaline rush," and that he was "just blabbering on." Mr. Adams indicated that he was afraid of Defendant.

Mr. Adams did not recall naming as possible suspects two African-American individuals known as "Shin" and "L.A." Mr. Adams stated that he could not remember statements made during the early portion of his interrogation and suggested that he did not "come down enough to remember" what he said until "about page 100 and something" of the transcript. Mr. Adams recalled that the police collected his clothing and that he asked the officers whether his clothing had any blood spatter on them. Mr. Adams explained that he was attempting to prove his innocence based on what he had seen on television. Mr. Adams agreed that, at one point, he suggested that Mr. Conrad was responsible but explained that he did not want to say Defendant's name because he was scared of him. Mr. Adams agreed that Mr. Sosa was his friend but admitted that, in his statement, he called Mr. Sosa "retarded" and "slow." Mr. Adams initially told the detective that he had not seen Mr. Sosa for a few months, but then stated that they had had a falling out about two weeks prior. Mr. Adams denied that the falling out was over Mr. Sosa's stealing Mr. Conrad's gun. Mr. Adams recalled that after nearly eleven hours of questioning, he accompanied the police to the tennis courts and looked in a wooded area for a gun.

Due to Mr. Adams's poor memory and the confusing nature of his prior statements read out of context, both parties and the trial court agreed to play for the jury two excerpts from Mr. Adam's video-recorded statement and to make the entire recording an exhibit. The recording consists of three disks covering a nearly twelve-hour span of time and containing multiple conversations between Mr. Adams and the detective. It is not clear to this Court which portions of the statement were played for the jury because the times indicated in the transcript do not seem to correspond to the timestamps on the video for any portion of the statement that would have much significance to either party.

From our review of the video, we note that while being advised of his rights, Mr. Adams denied being under the influence of drugs, but later told the detective that he had difficulty remembering things because he took Klonopin daily. Much of this first statement corresponds with questions asked of Mr. Adams on cross-examination. Mr. Adams told the detective that he wanted to get to the details of this "crazy story," which

he could corroborate because he had receipts and was on camera "at the time of the person's death." After Mr. Adams tried to give a timeline of his day, he eventually admitted to the detective that he went by the tennis courts after being told by a friend that "something crazy" had happened there. Mr. Adams stated that while he was at the scene "rubbernecking," another friend heard from someone that Mr. Sosa had two guns in the car when he was shot. Mr. Adams denied that Mr. Conrad said anything about meeting Mr. Sosa and denied knowing why Mr. Sosa was at the tennis courts.

Mr. Adams did not mention Defendant, whom he referred to as "Nate Gomez," until his second conversation with the detective almost an hour later. Mr. Adams told the detective that Defendant left the apartment around 10:00 or 11:00 p.m. to visit a girl named Tory. Mr. Adams denied that anyone at the apartment had a gun "as far as [he knew]." Mr. Adams initially denied meeting Defendant at Walmart, then stated that Defendant met them there ten to fifteen minutes after they had arrived. Mr. Adams told the detective that Defendant and Mr. Conrad were talking about beating up Mr. Sosa because he had stolen some marijuana and a gun. Mr. Adams said that Defendant might have told Mr. Conrad to call Mr. Sosa but then stated that Defendant pulled out a gun and made Mr. Conrad call Mr. Sosa.

The recording on the third disk begins after a gap of almost six hours, seemingly mid-conversation. The detective accused Mr. Adams, Mr. Conrad, Ms. Lovett, and Defendant of planning the shooting. Mr. Adams admitted that he and Defendant "fantasized" about it, that Defendant said he was going to do it, and that Mr. Conrad called Mr. Sosa on Defendant's phone to set it up. Mr. Adams stated that when Defendant met the others at Walmart, he told them that he had wrapped the gun in a black shirt and thrown it into the woods. Even though Mr. Adams said that Defendant went to the tennis courts by himself, he described where Defendant's and Mr. Sosa's vehicles were positioned in the parking lot and said that Defendant fired twelve shots. At various points throughout the recording, while the detective is out of the room, Mr. Adams can be seen talking to Mr. Conrad through the wall of the interview room about their situation and what had been said to the police, though Mr. Conrad's responses are inaudible.

Ms. Lovett also testified for the State. She stated that she was friends with Defendant and Mr. Adams, that she had just met Mr. Conrad, and that she did not know either Mr. Sosa or Ms. Bennett. Ms. Lovett admitted that she went to Walmart with Mr. Adams and Mr. Conrad and that they met Defendant there. She said that the four of them left the store in the same vehicle and that Defendant "said something about the dome," though Ms. Lovett could not remember if he said "he hit him in the dome or somebody hit him in the dome or he wanted to go home." She described Defendant as acting normal that night.

Ms. Lovett testified that on November 16, 2011, she was "hanging out" and smoking marijuana with Defendant, Mr. Adams, and Mr. Conrad. Mr. Adams was talking about an earlier confrontation with Mr. Sosa at a gas station and was "pretty pissed about it and started saying that he wanted something done and that he was going to get Christian somehow." Ms. Lovett tried to calm Mr. Adams down, but he remained upset and "fidgety." Both Mr. Conrad and Defendant were involved in the conversation. Defendant also seemed upset for "a little bit . . . then he stopped." Defendant then left, saying he was going to Tory's and that he would meet them later. Ms. Lovett then accompanied Mr. Adams and Mr. Conrad to Walmart.

Ms. Lovett testified that while the foursome were "hanging out" earlier in the evening, Mr. Adams kept bringing up something Mr. Sosa had done that "just wasn't right," but Ms. Lovett did not know what Mr. Sosa had done or to whom. Mr. Adams said that Mr. Sosa would "get paid back for it." Defendant seemed calm, "like he was listening." Mr. Adams talked about "getting rid of" Mr. Sosa while Defendant talked about fighting him. Ms. Lovett did not recall Defendant saying that Mr. Sosa should get what he deserved. After Mr. Adams spoke to Mr. Conrad in a back room, Mr. Conrad called Mr. Sosa. Ms. Lovett thought the conversation seemed "agitated" but did not know if they were arguing or talking. Ms. Lovett explained that Mr. Adams and Mr. Conrad talked about the Apison tennis courts and that Mr. Conrad told Mr. Sosa to meet him there. Ms. Lovett knew the others were talking about hurting Mr. Sosa before Mr. Conrad made the phone call and was afraid they were going to do something. When Mr. Adams said that Mr. Sosa's girlfriend would be with him, Defendant said that was not good; Mr. Adams called Ms. Bennett "the B word." When Defendant left, he did not say he was going to the tennis courts but said that if he saw Mr. Sosa, "they would get into it." Ms. Lovett explained that the plan was for her, Mr. Adams, and Mr. Conrad to go to Walmart to buy something so that "everybody would be seen." She stated that she was with Mr. Adams and Mr. Conrad all evening except for a brief period while at Walmart. She denied that they went to the tennis courts.

At the request of the State, Ms. Lovett's video-recorded statement to police was played for the jury.[10] In the video, the detective talking to Ms. Lovett indicated that he did not believe that she told the truth when they spoke earlier and that they were speaking again at Ms. Lovett's request. Ms. Lovett told the detective that she, Mr. Adams, Mr. Conrad, and Defendant were smoking marijuana in Mr. Adams's apartment. After Mr. Adams went to the gas station, he talked about an argument he had with Mr. Sosa and said that he wanted to "hit that bitch." Mr. Adams and Defendant were both upset because Mr. Sosa had either robbed them or disrespected someone. Ms. Lovett said that Defendant placed a gun on the table and, with Mr. Adams's encouragement, said he was

---

[10] The procedure by which this statement was admitted into evidence will be discussed in further detail in the Analysis section below.

- 10 -

going to do it. Mr. Adams stated that he wished that he "could get him back," and Defendant stated that Mr. Sosa needed to "get what he deserves." Ms. Lovett explained that Defendant would periodically calm down until Mr. Adams brought the subject back up and made him angry again.

Ms. Lovett admitted to the detective that after unsuccessfully trying to calm the other two down, she and Mr. Conrad helped them plan the shooting. She said that Mr. Conrad initially mentioned the tennis courts in Apison. Mr. Adams asked Mr. Conrad to call Mr. Sosa on Defendant's phone so that Mr. Sosa would not know that Mr. Adams was involved. When Mr. Sosa mentioned that Ms. Bennett would be with him, Defendant "backed off" because he did not want to do it "with a girl there." Mr. Adams then suggested that Ms. Bennett probably helped Mr. Sosa and that she would tell people that they were going to the tennis courts. Eventually, Defendant said that he was going to go through with it but did not say what he was going to do about Ms. Bennett. Mr. Conrad stated, "You know, if you kill Chris, you're going to have to get Meghan, too," and Defendant agreed that "she knows who I am." Ms. Lovett said that they originally did not know who was going to do it but that eventually Defendant "snapped" and said he was going to do it. Ms. Lovett explained that the plan was for her, Mr. Adams, and Mr. Conrad to go to Walmart and get a receipt and that Defendant would than meet them after it happened.

Ms. Lovett explained to the detective that Mr. Adams was concerned that they needed more time to plan, that she answered his questions about "CSI stuff," and that Defendant agreed to do it the following day. However, when Mr. Sosa called back, Mr. Adams became upset again, and Defendant agreed that it was "time to do this shit." Defendant left in his Cadillac, and the others went to Walmart in Mr. Adams's vehicle. Mr. Conrad was in touch by phone with both Mr. Sosa and Defendant. When Mr. Sosa was running late, Defendant said that he was going to leave until Mr. Conrad told him that Mr. Sosa was on the way. When Defendant met them outside the Walmart, he said, "I did it." In response to Mr. Adams's questions, Defendant said that he shot Mr. Sosa "in the dome" and that he was "pretty sure" that he also got Ms. Bennett. Ms. Lovett said she was not sure if Defendant was telling the truth until she saw the news the following morning and encountered police at Mr. Adams's apartment. Ms. Lovett denied hearing anyone say what had happened to the gun. Ms. Lovett admitted that she originally told the police that Defendant was in the car in the parking lot while the others were in Walmart.

On cross-examination, Ms. Lovett agreed that she made the following statement to Mr. Adams in an adjoining interrogation room:

> I'm not going to sit here and expletive make statements against me and expletive try to get me in trouble and I'm sitting here trying to help you and

- 11 -

you're sitting there and telling me you don't want to tell me all this other expletive. You're sitting over there blabbering your F'g [sic] mouth against me and I'm not going to spend 20 years in jail when you rat me out and everybody else but yourself.[11]

Ms. Lovett agreed that the video shown to the jury was not the first statement that she made to police and that she initially told them that Defendant did not have anything to do with the shooting. Ms. Lovett explained that an officer told her that she was going to get twenty years "if I kept saying that [Defendant] didn't have anything to do with it or if I didn't know or anything like that then I would be in conspiracy and I would be held accountable." Ms. Lovett testified that she believed that Mr. Adams "set it up and that he was trying to get [Defendant] to do something that he didn't want to do and that he was trying to get him in trouble." Ms. Lovett said that she "was being accused of liking him or wanting to be with him or something so I was trying to cover for him," though she did not clarify if she was talking about Defendant or Mr. Adams. Ms. Lovett admitted that on the night of the shooting, she talked to Mr. Adams about "CSI stuff," that Mr. Adams "just wanted Christian gone," and that she told Mr. Adams that they needed more time to plan as a way to calm him down. She admitted that she used the word "we" when she said "we figured out we were going to do it at Apison."

After the State rested its case-in-chief, Defendant made a motion for judgment of acquittal. When the motion was denied, Defendant called several witnesses to testify. First, Sergeant Yeargin[12] testified that he was involved in the arrest of Mr. Adams and Mr. Conrad around 3:00 a.m. the morning after the shooting. He testified that the apartment had a strong odor of marijuana and that Mr. Conrad was asleep in a back bedroom closet on top of a pile of clothes. Then, Caroline Grimes[13] testified that Defendant was issued a duplicate driver's license on July 5, 2011, and that the license in evidence had an issue date of April 20, 2011. Then, Sergeant Duane Hill testified that he was involved in the search of the area around the tennis courts. Sergeant Hill testified that he accompanied Captain Triplett to search a wooded area near a side road that was 200 to 300 yards away from the tennis courts. Sergeant Hill did not remember being told by Mr. Conrad that he and Defendant parked on that side road to smoke marijuana but agreed that his report said that Mr. Conrad volunteered to show them the area. Defendant elected not to testify.

---

[11] Defense counsel appears to have read from the transcript of a statement that is not reflected in the recording shown to the jury. That transcript is not in the record on appeal.

[12] Sergeant Yeargin did not state his first name on the record.

[13] Ms. Grimes was not asked her occupation, though at one point she is referred to by defense counsel as the "DMV keeper of records." Defendant states in his appellate brief that Ms. Grimes "is believed to work for the Drivers Services Division of the Tennessee Department of Safety."

In rebuttal, the State called Detective Rick Whaley, the lead agent on this case from the Hamilton County Sheriff's Office. Detective Whaley testified that even though he was not personally present for the search of the tennis courts, Mr. Conrad and Mr. Adams were not listed as participating in the search. Detective Whaley also testified that Mr. Conrad and Mr. Adams were both charged with conspiracy.

The jury found Defendant guilty as charged of first degree murder and attempted first degree murder. The trial court imposed a sentence of life in prison for first degree murder on June 5, 2014. After a sentencing hearing on August 11, 2014, the trial court imposed a concurrent sentence of fifteen years for attempted first degree murder.

### III. Motion for New Trial

On August 26, 2014, trial counsel filed a motion to withdraw as well as a motion to continue the deadline for filing a motion for new trial. On September 8, 2014, the trial court granted counsel's request to withdraw and appointed substitute counsel. There is no indication in the record that the court heard or disposed of Defendant's motion to continue the motion for new trial. After the case languished for nearly a year, substitute counsel was allowed to withdraw and appellate counsel was eventually appointed. At some point, Defendant filed a petition for post-conviction relief claiming ineffective assistance of counsel and requesting a delayed appeal.[14] The trial court, presided over by Judge Blackwood sitting by designation, entered an order on July 23, 2015, finding that the failure to file a motion for new trial substantially prejudiced Defendant. Defendant was granted 30 days to file a motion for new trial as well as the right to file a delayed appeal pursuant to Tennessee Supreme Court Rule 28, section 9(D)(1)(b).

A motion for new trial was filed on August 14, 2015, and an amended motion was filed on September 8, 2015. A hearing was held on the motion on November 20, 2015, before Judge Greenholtz as successor judge. The motion was denied in a memorandum order filed on February 18, 2016. Defendant filed a notice of appeal on February 29, 2016.

### Analysis

On appeal, Defendant argues that the trial court erred in denying his motion to suppress his statement because he had invoked his right to remain silent and the police failed to scrupulously honor his request. Defendant also argues that the trial court erred by denying his request for an interlocutory appeal of the suppression issue. Additionally,

---

[14] This petition, which was held in abeyance pending disposition of this appeal, does not appear in the technical record presently before this Court.

Defendant argues that the trial court erred in allowing the State to play the videotaped statement of Ms. Lovett during trial. Finally, Defendant argues that the trial court erred in denying both his motion for judgment of acquittal and motion for new trial and that the evidence is insufficient to support his convictions because the testimony of Ms. Lovett and Mr. Adams was not sufficiently corroborated.

## I.  Denial of Interlocutory Appeal

We address first Defendant's argument that the trial court erred when it denied his request to file an interlocutory appeal under Rule 9 of the Tennessee Rules of Appellate Procedure without providing an adequate rationale for its ruling. The State responds that Defendant has waived the issue by failing to provide an adequate record on appeal and by failing to cite any legal authority to support his claim that an erroneous denial of an interlocutory appeal would be grounds for reversal on direct appeal. Regardless of our disposition of the suppression issue, we agree with the State that Defendant would not be entitled to relief on the separate issue of the trial court's denial of his motion for permission to file an interlocutory appeal.

Under the Tennessee Rules of Appellate Procedure, there are two methods by which a party may seek to appeal an issue prior to the final disposition of the case: a Rule 9 interlocutory appeal and a Rule 10 extraordinary appeal. A Rule 9 appeal requires permission from both the trial court and the appellate court. *See* Tenn. R. App. P. 9(a). If the trial court denies permission to appeal under Rule 9, the appellant may seek permission directly from this Court under Rule 10. *See* Tenn. R. App. P. 10(a); *State v. McKim*, 215 S.W.3d 781, 791 (Tenn. 2007). Appellate courts review a trial court's denial of a motion for interlocutory appeal for an abuse of discretion. *Bailey v. Champion Window Co. Tri-Cities, LLC*, 236 S.W.3d 168, 172 (Tenn. Ct. App. 2007).

Under Rule 9, an appellant must "file and serve" a motion in the trial court seeking permission for leave to file an interlocutory appeal. Tenn. R. App. P. 9(b). The State points out that there is no written motion in the record on appeal. Appellate counsel responds that Defendant's motion for leave to file an interlocutory appeal was made orally. However, a review of the transcript of the pre-trial hearing in which the issue of the interlocutory appeal was addressed reveals that trial counsel specifically refers to a motion that he "filed a couple of weeks ago." No such motion appears in the record on appeal. It is well-settled that the party seeking appellate review has the duty to prepare an adequate record in order to allow for meaningful review. *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983); Tenn. R. App. P. 24(b). Without a written motion in the record, we do not know what the trial court may have considered when it simply stated that the motion was "overruled." In the absence of an adequate record, we must presume that the trial court's ruling was correct. *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

Moreover, Defendant has cited no legal authority that an erroneous denial of a motion for leave to file an interlocutory appeal is a ground for reversal of a conviction. *See* Tenn. R. App. P. 27(a)(7). In his reply brief, Defendant argues that his citation to the text of Rule 9, the standard of review set out in *Bailey*, 236 S.W.3d at 172, and over three pages of argument were sufficient citations to legal authority to satisfy Rule 27(a). We note that the only other case cited in Defendant's initial appellate brief was *State v. Meeks*, 262 S.W.3d 710, 719-21 (Tenn. 2008), which is inapposite because it addresses the ability of the State to bring an interlocutory appeal of a suppression issue. None of these sources provide legal authority for the relief sought by Defendant. In fact, several cases suggest that the proper method for an appellant to seek a remedy in such a situation is to apply directly to this Court for an extraordinary appeal under Rule 10. *Scott v. Pulley*, 705 S.W.2d 666, 672 (Tenn. Ct. App. 1985); *State v. Martin*, 634 S.W.2d 639, 643 (Tenn. Crim. App. 1982). Defendant did not seek an extraordinary appeal in this case.

Furthermore, there is no indication that this Court would have granted Defendant's request for an interlocutory appeal of his suppression motion. "Interlocutory appeals to review pretrial orders or rulings are generally 'disfavored,' especially in criminal cases." *Reid v. State*, 197 S.W.3d 694, 699 (Tenn. 2006) (quoting *State v. Gilley*, 173 S.W.3d 1, 5 (Tenn. 2005)). One of the "character of reasons" for granting a Rule 9 appeal is the "need to prevent irreparable injury." Tenn. R. App. P. 9(a)(1). In the case of a defendant seeking review of a denial of a suppression motion, there is no irreparable injury because the issue is preserved for review in a Rule 3 appeal as of right upon conviction or becomes moot upon acquittal. *See State v. Teel*, 793 S.W.2d 236, 245 (Tenn. 1990); *State v. Hartsfield*, 629 S.W.2d 907, 908 (Tenn. Crim. App. 1980); *cf. State v. Gawlas*, 614 S.W.2d 74, 76 (Tenn. Crim. App. 1980) (noting a "distinction in treatment between interlocutory appeals brought by the Government and those by a criminal defendant" due to the fact that "the Government may take no direct appeal from a judgment of acquittal and thus may suffer irreparable injury if interlocutory review is withheld"). Defendant is not entitled to any relief on the basis of the trial court's denial of his motion to seek an interlocutory appeal.

## II. Denial of Motion to Suppress Defendant's Statement

Defendant contends that the trial court erred in denying his motion to suppress his statement made to police on November 17, 2011. Defendant argues that he invoked his right to remain silent and that his assertion of his constitutional right was not scrupulously honored by the interviewing detectives. The State responds that the trial court correctly denied the motion to suppress because Defendant did not clearly and unambiguously invoke his right to remain silent.

In reviewing a trial court's ruling on a motion to suppress, this Court will uphold the trial court's findings of fact "unless the evidence preponderates otherwise." *State v. Bell*, 429 S.W.3d 524, 528 (Tenn. 2014) (citing *State v. Climer*, 400 S.W.3d 537, 556 (Tenn. 2013)). The party prevailing in the trial court is afforded "the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). Ordinarily, questions concerning the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). However, in this case, no witnesses testified at the suppression hearing, and the only evidence presented was the video of Defendant's interrogation. When the findings of fact are based entirely on evidence that does not involve issues of witness credibility, "appellate courts are as capable as trial courts of reviewing the evidence and drawing conclusions[,] and the trial court's findings of fact are subject to de novo review." *State v. Berrios*, 235 S.W.3d 99, 104 (Tenn. 2007) (citing *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). This Court may consider the entire record, including the evidence submitted at the suppression hearing and at trial, in evaluating the correctness of the trial court's ruling. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). Our review of the trial court's application of the law to the facts is de novo with no presumption of correctness. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001) (citing *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)).

### A. Invocation of Right to Remain Silent

Both the United States and Tennessee Constitutions protect a person from being compelled to give evidence against himself. *See* U.S. Const. amend. V; Tenn. Const. art. I, § 9. While the Fifth Amendment is applicable to the States, the test for voluntariness of confessions under the Tennessee Constitution is "broader and more protective of individual rights than the test [for] voluntariness under the Fifth Amendment." *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992). At a suppression hearing, the burden is on the State to prove by a preponderance of the evidence that a defendant made a valid waiver of his right to remain silent. *State v. Bush*, 924 S.W.2d 489, 500 (Tenn. 1997).

In *Miranda v. Arizona*, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). Although a person may make a voluntary and intelligent waiver of his rights, "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Id*. at 467. The giving of *Miranda* warnings is designed "to combat the inherently compelling pressures of in-custody interrogation and

to permit a full opportunity to exercise the privilege against self-incrimination." *Crump*, 834 S.W.2d at 268.

The *Miranda* court held that if a suspect "indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering further inquiries." 384 U.S. at 444-45. In other words,

> Once warnings have been given, . . . [i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

*Id.* at 473-74. "The fundamental purpose of the Court's decision in *Miranda* was 'to assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process.'" *Connecticut v. Barrett*, 479 U.S. 523, 528 (1987) (emphasis omitted) (quoting *Miranda*, 384 U.S. at 469).

More recently, the Supreme Court has clarified that, like the invocation of the right to counsel, the invocation of the right to remain silent must be unambiguous and unequivocal. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)) (holding that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel"); *see also State v. Dotson*, 450 S.W.3d 1, 53 (Tenn. 2014). A court must determine from an objective viewpoint whether "a reasonable police officer in the circumstances would understand the statement to be a request [to remain silent]." *Davis*, 512 U.S. at 459. Requiring a suspect to unambiguously invoke his *Miranda* rights prevents law enforcement officers from having to make "difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'" *Berghuis*, 560 U.S. at 382 (quoting *Davis*, 512 U.S. at 461). In other words, "[b]efore the police must honor a suspect's right to remain silent, the suspect must clearly articulate that right so that a reasonable police officer under the circumstances would understand the suspect's words and conduct to mean that the suspect wants to exercise his right to cut off further questioning." *State v. John E. Turner*, No. M2002-02454-CCA-R3-CD, 2003 WL 22970970, at *2 (Tenn. Crim. App. Dec. 18, 2003) (citing *State v. William M. Hukowicz*, No. M1999-00073-CCA-R9-CD, 2000 WL 1246430, at *2 (Tenn. Crim. App. Aug. 18, 2000), *no perm. app. filed*), *no perm. app. filed*.

- 17 -

The Supreme Court has directed courts to evaluate a defendant's request "as ordinary people would understand" it and "give a broad, rather than a narrow, interpretation to a defendant's request." *Barrett*, 479 U.S. at 529. "[A] suspect need not speak with the discrimination of an Oxford don," *Davis*, 512 U.S. at 459 (internal citation omitted), nor use any specific words or phrases, *Quinn v. United States*, 349 U.S. 155, 162 (1955). Courts should consider not only "the words spoken by the defendant and the plain meaning of those words," but also "the totality of the circumstances surrounding the statement in order to assess the words in context." *People v. Arroya*, 988 P.2d 1124, 1132 (Colo. 1999). "Where nothing about the request . . . or the circumstances leading up to the request would render it ambiguous, all questioning must cease." *Smith v. Illinois*, 469 U.S. 91, 98 (1984). However, courts should not use "context" to create an ambiguity and "raise a question regarding the intended scope of a facially unambiguous invocation of the right to silence." *Anderson v. Terhune*, 516 F.3d 781, 787 (9th Cir. 2008); *see also United States v. Rambo*, 365 F.3d 906, 910 (10th Cir. 2004) ("Although the context and nuances of a request to end questioning can create ambiguity, they cannot overcome a clear expression of the desire to remain silent."). Additionally, the fact that a particular statement may have "reasonable competing inferences that could be drawn from the context" does not mean that the statement is ambiguous. *Saeger v. Avila*, 930 F. Supp. 2d 1009, 1015 (E.D. Wis. 2013) (finding the state court's interpretation of the defendant's statement—"I got nothin[g] more to say to you. I'm done. This is over"—as equivocal because it could be interpreted as a negotiating ploy to be an unreasonable application of clearly established federal law).

As the Supreme Court of Nebraska has explained based on its review of cases from multiple jurisdictions, "patterns have emerged from the case law that provide context to our application of these rules" regarding the invocation of the right to remain silent. *State v. Rogers*, 760 N.W.2d 35, 58 (Neb. 2009). While still considering the surrounding circumstances, generally statements have not been found to be a clear and unambiguous invocation of the right to remain silent when they are "prefaced by words of equivocation, such as 'I think,' 'maybe,' or 'I believe;'" when they are "phrased in terms of a hypothetical;" when "the language of the statement itself indicates simply that the suspect has finished his or her colloquy of events—as opposed to a wish to cease speaking altogether;" when "the suspect says he or she is not yet ready to speak;" when the statements "indicate only the suspect's desire to avoid answering a particular question or to avoid speaking about particular themes;" or when "a single statement under consideration is internally inconsistent," such that "what might otherwise be a clear statement is inextricably attached to language inconsistent with a wish to remain silent." *Id*. at 58-60 (internal citations omitted). Additionally, a statement may be deemed ambiguous when a defendant expresses "indecision or ambivalence toward waiving his rights." *Kupferer v. State*, 408 S.W.3d 485, 490 (Tex. App. 2013). However, statements that are "neither prefaced nor immediately followed by words diminishing their meaning[] are generally considered to be clear and unambiguous invocations of the right

to cut off questioning." *Rogers*, 760 N.W.2d at 60. Additionally, the fact that a suspect responded to further interrogation after the alleged invocation "may not be used to cast doubt on the clarity of the initial request itself." *Smith*, 469 U.S. at 100.

Several cases from this state likewise indicate the type of statements that will be considered clear invocations of the right to remain silent. In *Crump*, the Tennessee Supreme Court held that the defendant's statement, "I don't have anything to say," in response to the detective's reading of the *Miranda* warnings was "sufficient to assert the legal right to remain silent." 834 S.W.2d at 270 (citing *O'Brien v. State*, 426 S.W.2d 507, 508 (Tenn. 1968)). In *William M. Hukowicz*, the defendant turned himself in and gave a taped statement to the police. 2000 WL 1246430, at *1. When the detective asked the defendant to tell him what happened, the defendant responded, "I cannot comment on that." *Id*. The defendant further stated, "I really do want to tell you, but I just know better." *Id*. The detective continued questioning the defendant, and the defendant answered several questions with "no comment." *Id*. This Court, applying the *Davis* standard, held that "although the defendant did not stand mute or assert that he did not want to answer any questions, we find ample evidence to support the trial court's finding that the defendant invoked his right to remain silent." *Id*. at *3. In *John E. Turner*, after waiving his *Miranda* rights, the defendant stated during the early portion of the interview, "I don't have anything to say," and he "continually denied any knowledge of the events." 2003 WL 22970970, at *1. This Court held that the defendant had clearly invoked his right to remain silent and that he did not reinitiate further communication "by repeatedly asking what was going to happen to him and whether he could work out a deal." *Id*. at *2-3. On the other hand, a "defendant's request to speak to officers other than those conducting the interview did not amount to an invocation, ambiguous or unambiguous, of his right to remain silent." *Dotson*, 450 S.W.3d at 53.

The trial court in this case did not enter a written order detailing its findings of fact and conclusions of law. Before taking the matter under advisement in order to read case law submitted by the parties, the trial court stated at the conclusion of the hearing that it did not interpret Defendant's statement "I ain't got nothing else to say" as an invocation of the right to remain silent. Because a minute entry indicates that the trial court denied the motion, we presume that the trial court adopted its statements during the hearing as its findings of fact and conclusions of law. However, the evidence in the record preponderates against the trial court's determination that Defendant did not clearly and unequivocally invoke his right to remain silent.

The exact words of Defendant to be placed under the Fifth Amendment microscope are: "Well, then I ain't got nothing else to say 'cause I done told you whatever I know." The words Defendant used were not equivocal, conditional, or hypothetical. Defendant did not express indecision or ambivalence toward waiving his rights. Defendant's statement was not internally inconsistent with a desire to cut off

questioning nor sought to encourage further dialogue. Defendant was not concluding a colloquy of events but was responding to the detective's refusing to believe his protestations of innocence and treating him "like . . . a fool." The trial court interpreted the statement to mean "[t]here's nothing more I can tell you about it" or "that's my story and I'm sticking to it." However, even these interpretations of Defendant's words are consistent with a desire to cut off further questioning. Moreover, the fact that the detective in this case immediately ceased questioning Defendant, gathered his paperwork, and left the room supports the conclusion that a reasonable police officer would interpret Defendant's statement as an unequivocal invocation of his right to remain silent, regardless of the detective's actual subjective intent. *See Arroya*, 988 P.2d at 1134 (concluding that when "the detective stopped questioning [the defendant] immediately after she stated[,] ['I don't wanna talk no more,' it] demonstrat[ed] that the detective himself interpreted the statement to mean that [the defendant] wanted questioning to cease," despite the detective's testimony that he interpreted the defendant's statement as simply indicating that she wanted to take a break).

The State argues that Defendant's statement was ambiguous because it could be interpreted as "a reiteration of the [D]efendant's claim that he had relayed all he knew about the shooting." The State relies on *State v. McCorkendale*, 979 P.2d 1239, 1247 (Kan. 1999) (finding "So that's all I [got] to say" could be "interpreted as a statement that he had finished his explanation of the matter"), and *State v. Aleksey*, 538 S.E.2d 248, 253-54 (S.C. 2000) (finding "That's all I've got to say" could "indicat[e] either a desire to discontinue questioning or simply the end of his story"). However, "a suspect seeking to invoke his right to silence" is not required to "provide any statement more explicit or more technically-worded than 'I have nothing to say.'" *Arnold v. Runnells*, 421 F.3d 859, 865 (9th Cir. 2005). Defendant's statement in this case is remarkably similar to the defendant's statement in *John E. Turner*, especially given the fact that both statements were made while the defendants continuously denied any knowledge of the events in question. 2003 WL 22970970, at *1. Moreover, any potential ambiguity created by Turner's questions about what was going to happen to him—which this Court rejected— is notably absent in this case. *See id.* at *3. Furthermore, several courts from other jurisdictions have found strikingly similar statements to be clear and unequivocal invocations of the right to remain silent. *See State v. Szpyrka*, 202 P.3d 524, 527 (Ariz. Ct. App. 2008) (finding no meaningful distinction between "I got nothin' to say" and "I wish to remain silent"); *see also Christopher v. Florida*, 824 F.2d 836, 840 (11th Cir. 1987) ("I got nothing else to say."); *United States v. Reid*, 211 F. Supp. 2d 366, 372 (D. Mass. 2002) ("I have nothing else to say."); *State v. Finehout*, 665 P.2d 570, 573 (Ariz. 1983) ("I ain't going to say any more."); *Dubon v. State*, 982 So. 2d 746, 746 (Fla. Dist. Ct. App. 2008) ("I have nothing to say" said at least three times); *Mack v. State*, 765 S.E.2d 896, (Ga. 2014) ("I'm done. I have no more to say. I'm done. Let's ride."); *People v. Douglas*, 778 N.Y.S.2d 622, 623 (App. Div. 2004) ("I have nothing further to

say."); *State v. Goetsch*, 519 N.W.2d 634, 636 (Wis. App. 1994) ("I don't want to talk about this anymore. I've told you, I've told you everything I can tell you.").

The State also argues that Defendant's statement was ambiguous because it was "one of frustration with the officer's unwillingness to believe the [D]efendant's story or believe that he was not involved in the crime." The State relies on *State v. Thomas*, 673 N.W.2d 897, 908 (Neb. 2004) ("I'm done talkin' man, I know what I did, how can ya'll keep on saying I did it[?]"), and *State v. Chapman*, 605 A.2d 1055, 1059 (N.H. 1992) ("There is nothing else to tell you," and, "I need not say no more[, c]ause I told you all there was to tell you."), for the proposition that protestations of innocence are not unequivocal invocations of the right to remain silent. However, both of those cases are distinguishable because the supposed invocation is immediately followed by "a question requesting further information, which also acted to encourage further dialog[ue]." *Thomas*, 673 N.W.2d at 908; *see also Chapman*, 605 A.2d at 1060 (noting that "there is no discernable pause, other than a normal intake of breath between sentences, before the defendant continues by saying, 'What do you want me to do, lie to you[?]'"). Furthermore, it is irrelevant that a suspect invokes his right to remain silent in an "outburst" of frustration. *See Anderson*, 516 F.3d at 788. A "statement[] of frustration" does not undermine an otherwise unambiguous invocation because a "suspect can both be frustrated with an interrogation and seek to terminate it." *Id*. While a defendant's motive for invoking the right to remain silent is irrelevant, *see Anderson v. Smith*, 751 F.2d 96, 105 (2d Cir. 1984) (holding that "the interrogator never needs to know why a suspect wants to remain silent"), frustration with an officer's line of questions or refusal to believe a defendant's claims of innocence is certainly a reason to want to terminate further questioning.

Based on our review of the video-recorded interrogation, Defendant unequivocally and unambiguously invoked his right to remain silent. The first detective immediately ceased questioning Defendant as he was required to do under *Miranda*. We must now determine whether Defendant's statements to Detective Gienapp, which were ultimately used by the State to show Defendant's knowledge of the details of the shooting, should have been suppressed.

### B. Failure to Scrupulously Honor Invocation

Although the police must immediately cease their interrogation when a suspect unambiguously invokes his right to remain silent, there are circumstances under which the police may resume questioning the suspect without violating his right against self-incrimination. *See Crump*, 834 S.W.2d at 269. In *Michigan v. Mosley*, the United States Supreme Court held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" 423 U.S. 96, 104 (1975) (quoting

*Miranda*, 384 U.S. at 474, 479).  A constitutional violation occurs when "the police fail[] to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind."  *Id.* at 105-06.  In other words, "[i]f no significant factual event occurs to demonstrate that the suspect chose to resume answering questions after clearly asserting the right to remain silent, then the *Miranda* right to cut off questioning was not 'scrupulously honored.'"  *Arroya*, 988 P.2d at 1135.

Whether the police have scrupulously honored a defendant's invocation of his right to remain silent before they resume questioning must be determined under the totality of the circumstances.  *State v. Huskey*, 177 S.W.3d 868, 880 (Tenn. Crim. App. 2005).  Some factors to consider include whether the police "immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation."  *Mosley*, 423 U.S. at 106. However, "reinterrogation of a suspect concerning the same subject matter does not constitute a per se violation of *Miranda* under *Mosley*."  *Huskey*, 177 S.W.3d at 880. Additionally, one officer's lack of knowledge that the defendant previously invoked his right to remain silent while speaking with another officer is irrelevant.  *See Crump*, 834 S.W.2d at 269 (citing *Arizona v. Roberson*, 486 U.S. 675, 687 (1988)).  "Once a law enforcement officer has knowledge that a defendant has been read his *Miranda* rights and has declined to speak with the police, that officer should not participate in the questioning of that defendant or allow another officer to do so."  *State v. Steven Jeffrey Pike*, No. E2015-02357-CCA-R3-CD, 2017 WL 363283, at *20 (Tenn. Crim. App. Jan. 25, 2017), *perm. app. denied* (Tenn. Apr. 12, 2017).  Moreover, it is not "an accused's burden to inform law enforcement that he has previously invoked his right to remain silent."  *Id.*

In this case, when Defendant stated, "I ain't got nothing else to say," the first detective immediately ceased questioning Defendant and left the room.  After a short span of just over nine minutes, Detective Gienapp entered the room and promptly resumed questioning Defendant about the same crime without administering new *Miranda* warnings.  Defendant did not reinitiate the conversation.  Detective Gienapp interrogated Defendant multiple times over the course of two hours, urging Defendant to tell the truth about where he was, who he was with, and what happened on the day of the shooting.  There was "no sustained cessation of questioning" such that we could find that the police scrupulously honored Defendant's invocation of his right to remain silent.  *See Steven Jeffrey Pike*, 2017 WL 363283, at *21; *see also Arroya*, 988 P.2d at 1135 (concluding that police did not scrupulously honor defendant's invocation of her right to remain silent when the same detective resumed questioning her about the same crime after only a short break without re-advising her of her rights or making any effort to clarify her statement that she did not want to talk anymore).

The police officers in this case did not scrupulously honor Defendant's invocation of his right to remain silent. Therefore, we must determine whether Defendant's statement to Detective Gienapp was voluntary.

## C. Voluntariness of Subsequent Statement

"Once an individual invokes his right to remain silent and the police fail to honor that invocation by continuing to interrogate him, that violation, by definition, is of constitutional magnitude" rather than simply a violation of *Miranda*'s prophylactic rules. *Crump*, 834 S.W.2d at 270. The inquiry then "becomes whether the subsequent confession was involuntary, and whether it was obtained as a result of that violation and therefore must be excluded as tainted 'fruit of the poisonous tree.'" *Id*. (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)). When determining the voluntariness of a confession, this Court considers the totality of the circumstances and "whether the conduct of the law enforcement officers was such to undermine the accused's free will and critically impair his capacity for self-determination so as to bring about an involuntary confession." *Id*. (citing *Elstad*, 470 U.S. at 318; *State v. Kelly*, 603 S.W.2d 726, 728-29 (Tenn. 1980)).

In *Crump*, the supreme court applied the factors for determining voluntariness of a statement originally articulated in *State v. Smith*, 834 S.W.2d 915, 919-20 (Tenn. 1992), in the context of a second confession after an initial unwarned confession and subsequent *Miranda* warnings. *Crump*, 834 S.W.2d at 270. These factors include, but are not limited to, the provision of proper *Miranda* warnings, the temporal proximity of the constitutional violation and the subsequent statement, the presence of any intervening circumstances, and the purpose and flagrancy of the police misconduct. *John E. Turner*, 2003 WL 22970970, at *3 (citing *State v. Huddleston*, 924 S.W.2d 666, 674-75 (Tenn. 1996); *Crump*, 834 S.W.2d at 272).

In this case, while Defendant received *Miranda* warnings from the first detective and executed a valid waiver of his rights, there was no subsequent provision of *Miranda* warnings before Detective Gienapp resumed the interrogation. Defendant did not reinitiate the conversation. Defendant's statements to Detective Gienapp about what Mr. Conrad supposedly told him about the shooting were made less than two hours after Defendant invoked his right to remain silent. Detective Gienapp spoke to Defendant multiple times over the course of those two hours. Defendant remained in custody in the interrogation room the entire time. There were no intervening circumstances "such that the subsequent confession may be fairly said to have resulted from an independent and voluntary act of free will, rather than a continuous chain of events initiated by the improper questioning." *Crump*, 834 S.W.2d at 271. Even though the burden is on the State to rebut the presumption that the constitutional violation tainted a subsequent statement made by the defendant, *Crump*, 834 S.W.2d at 272, the State limited its

argument on appeal to whether Defendant clearly and unambiguously invoked his right to remain silent. However, based on the record before us, we conclude that Defendant's statement to Detective Gienapp was not sufficiently removed from the constitutional violation and, thus, was not voluntary. Therefore, Defendant's statements to Detective Gienapp should have been suppressed, and the admission of those statements at trial was error.

*D. Harmless Error*

Having determined that Defendant's statements to Detective Gienapp should have been suppressed as a result of the failure of police to scrupulously honor his invocation of his right to remain silent, we must next determine whether the erroneous admission of these statements requires reversal of Defendant's convictions. "The erroneous admission of evidence obtained in violation of a defendant's *Miranda* rights is a non-structural constitutional error." *Climer*, 400 S.W.3d at 569. Non-structural constitutional errors do not require automatic reversal but are subject to a harmless error analysis. *Id.*; *see State v. Cauthern*, 778 S.W.2d 39, 46 (Tenn. 1989) (citing *Chapman v. California*, 386 U.S. 18 (1967)). However, the burden on the State is "'quite stringent'" to prove "'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Climer*, 400 S.W.3d at 569 (quoting *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). "An inquiry into harmless error does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct." *Rodriguez*, 254 S.W.3d at 372. The proper inquiry is whether the "error more probably than not had a substantial and injurious impact on the jury's decision-making." *Id.* (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Upon our view of the record, we cannot conclude that the evidence was so overwhelming that the verdict was surely unattributable to the erroneous admission of Defendant's inculpatory statement. As will be discussed in further detail in the following sections, the evidence in this case was largely circumstantial. While a guilty verdict may certainly be based entirely on circumstantial evidence, *see State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011), Defendant's statement in this case formed "the foundation on which the remaining circumstantial evidence rested," *Climer*, 400 S.W.3d at 570. The State began its closing argument by playing a portion of Defendant's statement and asking the jury whether Defendant "sound[ed] like someone who was told about a shooting or . . . like someone who's reliving it." Additionally, the State's theory of the motive in this case came entirely from Defendant's statement where he admitted having a "beef" with Mr. Sosa over a stolen gun. The United States Supreme Court has recognized that a defendant's statement "'is probably the most probative and damaging evidence that can be admitted against him.'" *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139 (1968) (White, J., dissenting)). Because of the very high likelihood that the admission of Defendant's

statement had an impact upon the verdict rendered by the jury, we conclude that the error was not harmless. Therefore, we must reverse Defendant's convictions and remand the case for a new trial. Upon remand, any statement made by Defendant after he invoked his right to remain silent is inadmissible.

## III. Corroboration of Accomplice Testimony

Because we have determined that the admission of Defendant's statement was not harmless error and that this case should be remanded for a new trial, we will not address the overall sufficiency of the evidence or the propriety of the trial court's denial of Defendant's motion for judgment of acquittal and motion for new trial.[15] However, Defendant's primary argument on those issues was that the testimony of the accomplices, Mr. Adams and Ms. Lovett, was not sufficiently corroborated. Because a finding of insufficient corroboration of accomplice testimony is the same as a finding of insufficient evidence to support the verdict, thereby barring retrial, *see State v. Allen*, 10 S.W.3d 286, 292 (Tenn. Crim. App. 1999) (citing *State v. Williford*, 824 S.W.2d 553, 554 (Tenn. Crim. App. 1991)), we will examine the properly admitted evidence to determine if there was sufficient corroboration of the accomplices' testimony.

"When the only proof of a crime is the uncorroborated testimony of one or more accomplices, the evidence is insufficient to sustain a conviction as a matter of law." *State v. Jones*, 450 S.W.3d 866, 888 (Tenn. 2014) (citing *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013)). An accomplice is "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." *Id*. The test for whether a witness qualifies as an accomplice is whether he or she could be indicted for the same offense charged against the defendant. *Id*. There was testimony in this case that Mr. Adams was charged with conspiracy to commit murder. Though there is nothing in the record to suggest that Ms. Lovett was also charged, the trial court found that both Mr. Adams and Ms. Lovett were accomplices as a matter of law and agreed to charge the jury with the accomplice instruction, and this determination has not been challenged on appeal.

Although a defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice, the longstanding rule has been that only slight corroboration is required. *See Hawkins v. State*, 469 S.W.2d 515, 520 (Tenn. Crim. App. 1971). It is well-settled that "corroborative evidence may be direct or entirely circumstantial, and it

---

[15] We note that a defendant waives any claim of error in the denial of a motion for judgment of acquittal made at the close of the State's case-in-chief by choosing to present proof or otherwise participate in the trial. *State v. Collier*, 411 S.W.3d 886, 893 (Tenn. 2013); *Finch v. State*, 226 S.W.3d 307, 316-17 (Tenn. 2007). However, the standard by which the trial court determines a motion for judgment of acquittal is identical to the standard which applies on appeal in determining the sufficiency of the evidence after a conviction. *State v. James*, 315 S.W.3d 440, 455 (Tenn. 2010).

need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged." *Jones*, 450 S.W.3d at 888 (emphasis omitted) (quoting *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001)). In other words,

> there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. . . . It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). Corroboration of an accomplice's testimony cannot come from the testimony of another accomplice. *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001) (citing *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995)).

In this case, there is certainly plenty of independent evidence that a crime occurred. Ms. Bennett testified that she and Mr. Sosa were fired upon while sitting in her car in the parking lot of the Apison tennis courts. The passenger side door of Ms. Bennett's car was riddled with bullet holes. A corresponding number of shell casings were found in and around the parking lot of the tennis courts. The medical examiner testified that Mr. Sosa died as a result of multiple gunshot wounds.

The question, then, is whether there is some independent fact that corroborates Mr. Adams's and Ms. Lovett's testimony identifying Defendant as the shooter. Though she could not see the shooter's face, Ms. Bennett testified that he was a "bigger guy" and that he was wearing all black. Ms. Bennett agreed that Defendant is a "bigger guy" than Mr. Conrad, and the photographs from the Walmart security cameras show Defendant wearing all black shortly after the shooting had been reported to 911. Additionally, the Walmart photographs show Mr. Conrad, Mr. Adams, and Ms. Lovett entering the store together prior to Defendant's arrival, corroborating that aspect of their plan. Detective Gienapp testified that his shortest drive time between the tennis courts and the Walmart was just over 12 minutes, indicating that it would be very difficult for Mr. Conrad, Mr. Adams, and Ms. Lovett to arrive at the store roughly 9 minutes after 911 received a call reporting the shooting; on the other hand, Defendant arrived at the Walmart approximately 22 minutes after the 911 call. The discovery of Defendant's old driver's license on a nearby side road indicates his familiarity with the area around the tennis courts. While this evidence corroborating Defendant's identity as the shooter may not be overwhelming, it is sufficient under the standard set out above.

## IV. Prior Inconsistent Statement

In case of further appellate review, as well as to provide guidance upon retrial, we shall also address Defendant's argument that the trial court erred in allowing the State to play the entire recorded interrogation of Ms. Lovett for the jury as a prior inconsistent statement. The State argues that Defendant failed to raise a contemporaneous objection to the admission of the evidence at trial, thereby waiving the issue on appeal. While noting that "some objection" was made, Defendant concedes "that trial counsel did not properly raise an objection to the admission of the full videotaped interrogation of [Ms.] Lovett" and argues that the issue should be reviewed for plain error.

A prior inconsistent statement of a witness may be offered as either impeachment evidence or as substantive evidence, and the rules governing its admissibility depend upon the purpose for which it is offered. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). However, a trial court "has no duty to exclude evidence or to provide a limiting instruction to the jury in the absence of a timely objection." *Id.*; *see* Tenn. R. Evid. 103(a)(1) (requiring "a timely objection . . . stating the specific ground of objection if the specific ground was not apparent from the context"). Moreover, the failure to raise a contemporaneous objection to the admission of evidence at trial typically results in waiver of the issue on appeal. Tenn. R. App. P. 36(a).

Defendant concedes that he did not properly object to the admission of the video-recording of Ms. Lovett's police interview. Therefore, we will review the issue for plain error. *See* Tenn. R. Evid. 103(d); Tenn. R. App. P. 36(b). There are five factors that must be established before this Court will recognize plain error:

(a) the record clearly establishes what occurred in the trial court;

(b) a clear and unequivocal rule of law was breached;

(c) a substantial right of the accused was adversely affected;

(d) the accused did not waive the right for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

*Smith*, 24 S.W.3d at 282 (adopting the test established by *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The burden is on the defendant to establish all five factors, and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id*. at 283. Furthermore, the error must be of "such a great magnitude that it probably changed the outcome of the trial." *Id.*

The record in this case clearly establishes what occurred in the trial court. During Ms. Lovett's direct examination, the prosecutor used a transcript of Ms. Lovett's interview with police in order to attempt to refresh her recollection as to whether Defendant said that Mr. Sosa "should get what he deserved." Ms. Lovett admitted to making a statement to police and, after reviewing the transcript, stated that it did "[n]ot really" refresh her memory about what Defendant had said. The prosecutor moved on to other questions about the events on the night in question but did not ask Ms. Lovett whether she recalled making any other specific statements during the police interview or otherwise use the transcript to further refresh her recollection.

Defense counsel at one point objected to the prosecutor leading the witness, to which the prosecutor responded that he intended to play the recording of Ms. Lovett's police interview in order to impeach her. The prosecutor explained that her testimony was "inconsistent with respect to her entire statement." The trial court suggested that he continue trying to refresh her recollection.[16] Direct examination resumed with the prosecutor asking further details about the night in question, but he did not ask Ms. Lovett whether she recalled telling the police anything inconsistent with her trial testimony. In response to a second objection to leading, the prosecutor again requested to play the recording, stating that Ms. Lovett's testimony was "wrong 47 different ways" and that there was "no way to parse it out." The trial court agreed to let the State play the recorded statement. Defense counsel then stated, "I would suggest that the proper way to do this is to piecemeal it." The trial court responded, "I don't think at this point that's possible" because her testimony, like Mr. Adams's, was "such a mess." The recording was then played for the jury in its entirety, and the trial court did not provide any type of limiting instruction to the jury.

Secondly, a clear and unequivocal rule of law has been breached. Extrinsic evidence of a prior inconsistent statement is not admissible "unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b). If the witness admits to making the prior statement, then extrinsic evidence of the prior inconsistent statement is inadmissible because it would be cumulative and consistent with the witness's testimony at trial. *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998). However, the admission of extrinsic evidence of a prior inconsistent statement is appropriate if the witness "denies or does not recall making the statement" or if the witness "equivocates about making it." *State v. Ackerman*, 397 S.W.3d 617, 638 (Tenn. Crim. App. 2012); *State v. Kendricks*, 947

---

[16] Using a writing to refresh a witness's memory under Tennessee Rule of Evidence 612 is a separate and distinct evidentiary issue from the admission of a witness's prior inconsistent statement. The trial court made a similar instruction to defense counsel during his cross-examination of Mr. Adams by describing the procedure laid out in the Advisory Commission Comments to Rule 612.

S.W.2d 875, 882 (Tenn. Crim. App. 1996). Only those portions of the statement that the witness denies or cannot recall making would be admissible under Rule 613(b). *State v. Foust*, 482 S.W.3d 20, 41 (Tenn. Crim. App. 2015) (citing *Martin*, 964 S.W.2d at 567).

Because hearsay statements are typically not admissible, *see* Tenn. R. Evid. 802, "prior inconsistent statements offered to impeach a witness are to be considered only on the issue of credibility, and not as substantive evidence of the truth of the matter asserted in such statements," *State v. Reece*, 637 S.W.2d 858, 861 (Tenn. 1982). However, Tennessee Rule of Evidence 803(26) provides a hearsay exception for a testifying witness's prior inconsistent statement when the statement would be "otherwise admissible under Rule 613(b)" and satisfies the following conditions:

> (A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

> (B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

> (C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

The Advisory Commission Comments clarify that "only prior inconsistent statements, and not consistent statements, are within the ambit of this rule." *See* Tenn. R. Evid. 803(26), Adv. Comm'n Cmts. The party seeking to have the statement treated as substantive evidence should request the required jury-out hearing. *Id*.

In this case, Ms. Lovett was never given the opportunity to explain or deny her statement as required by Rule 613(b). The prosecutor did not, as suggested by defense counsel, "piecemeal it" by asking Ms. Lovett whether she recalled making specific statements within her interview. *Cf. State v. Roderick Quatel Bates and Emmett Jones*, No. E2014-01741-CCA-R3-CD, 2015 WL 9019818, at *12 (Tenn. Crim. App. Dec. 15, 2015) (holding that the witness's prior statement was admissible under Rule 613(b) where "[t]he State confronted [the witness] with the contents of her statement line by line, as required by the rule"), *perm. app. denied* (Tenn. May 5, 2016). Additionally, the trial court did not redact the video to only those portions that were inconsistent with Ms. Lovett's trial testimony and that Ms. Lovett either denied or did not recall making. *See State v. Charles Jackson and Willis Holloway*, No. W2010-01133-CCA-R3-CD, 2012 WL 543047, at *10 (Tenn. Crim. App. Feb. 17, 2012) (finding error in the admission of an un-redacted statement which included portions that were consistent with the witness's testimony as well as inconsistent portions about which the witness was not confronted), *perm. app. denied* (Tenn. June 22, 2012).

Even though the prosecutor stated that he intended to use the statement to impeach Ms. Lovett, the trial court did not give a limiting instruction to the jury that the statement could only be considered as reflecting upon Ms. Lovett's credibility. *See Smith*, 24 S.W.3d at 279 (citing Tenn. R. Evid. 105). Therefore, the recording was entered as substantive evidence and was subject to the requirements of Rule 803(26) to be properly admissible as an exception to the hearsay rule. While Ms. Lovett testified, was subject to cross-examination, and her statement was video recorded, the trial court did not perform "its gatekeeping function as outlined in Rule 803(26)" for the statement to be admitted as substantive evidence. *See Foust*, 482 S.W.3d at 40. The State did not request, and the trial court did not conduct, a hearing outside the presence of the jury to determine whether the "statement was made under circumstances indicating trustworthiness." *See* Tenn. R. Evid. 803(26), Adv. Comm'n Cmts. The trial court did not question Ms. Lovett about the circumstances of her making the statement, did not listen to the statement before it was played, and did not make any findings on the record with regard to the statement's trustworthiness. *See Foust*, 482 S.W.3d at 40. We reject the State's contention that the trial court's seeming familiarity with the statement is an adequate substitute for a finding on the record that the statement was made under circumstances indicating trustworthiness. *Cf. State v. Harold Francis Butler*, No. E2014-00631-CCA-R3-CD, 2015 WL 2233122, at *8-9 (Tenn. Crim. App. May 11, 2015) (holding that the trial court did not err in finding that the prior inconsistent statement was made under circumstances indicating trustworthiness after conducting "a lengthy hearing outside the presence of the jury"), *perm. app. denied* (Tenn. Sept. 17, 2015). Therefore, the trial court erred in admitting the recording of Ms. Lovett's police interview as either impeachment evidence or substantive evidence.

Additionally, a substantial right of Defendant was adversely affected and consideration of the error is necessary to do substantial justice. As discussed above, the State did not request, and the trial court did not conduct, the jury-out hearing required by Rule 803(26) to determine whether the statement was made under circumstances indicating trustworthiness. The primary purpose of the various exceptions to the hearsay rule is to "admit only hearsay evidence that exhibits inherent trustworthiness and indicia of reliability." *Arias v. Duro Standard Prods. Co.*, 303 S.W.3d 256, 263 (Tenn. 2010) (citing Neil P. Cohen, et al., Tennessee Law of Evidence § 8.01[3][c] at 8-12). There is conflicting evidence in this case as to whether the statement was made under circumstances indicating trustworthiness. On the one hand, the State points out that Ms. Lovett voluntarily reinitiated communication with the police and implicated herself in a conspiracy to commit murder. On the other hand, Defendant points out that Ms. Lovett made an earlier statement that did not implicate Defendant and that she changed her statement after being threatened with jail time and communicating with Mr. Adams. A trial court, not this Court, is in the best position to make the necessary "factual findings and credibility determinations in the course of ruling on an evidentiary motion."

*Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). This Court reviews those findings only to determine whether the record preponderates against them. *Id*. Without any semblance of a factual determination as to the trustworthiness of the statement, we can only conclude that the statement was inadmissible as substantive evidence. Moreover, admission of the entire un-redacted statement allowed the jury to consider hearsay statements from Mr. Conrad and the detectives, presenting additional confrontation issues.

Typically, when a party does not object to hearsay evidence, "the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible.'" *Smith*, 24 S.W.3d at 280 (quoting *State v. Harrington*, 627 S.W.2d 345, 348 (Tenn. 1981)). However, there is "a limited exception" when the trial court fails to give a contemporaneous instruction that the jury may only consider a prior inconsistent statement as impeachment evidence, even in the absence of a request by the defendant. *See State v. Carl McKissack*, No. W1999-01136-CCA-R3-CD, 2000 WL 674591, at *4 (Tenn. Crim. App. May 24, 2000) (citing *Reece*, 637 S.W.2d at 861), *no perm. app. filed*. The failure to give a limiting instruction "may amount to fundamental error constituting grounds for reversal" when "the State's case is weak and the prior inconsistent statements are extremely damaging." *Reece*, 637 S.W.2d at 861; *see also State v. Emit Keith Cody*, No. E2000-02188-CCA-RM-CD, 2000 WL 1742698, at *5 (Tenn. Crim. App. Nov. 28, 2000) (noting that *Smith*, 24 S.W.3d at 284, acknowledged and did not overrule the holding in *Reece*), *no perm. app. filed*. The holding in *Reece* is "limited to those exceptional cases in which the impeaching testimony is extremely damaging, the need for the limiting instruction is apparent, and the failure to give it results in substantial prejudice to the rights of the accused." 637 S.W.2d at 861.

In this case, like in *Reece*, the State's case hinged largely on the testimony of witnesses who were themselves implicated in the crime. Additionally, like in *Reece*, no witness was able to definitively identify Defendant as the culprit. Ms. Bennett initially identified the shooter as Mr. Conrad, even though she agreed that Defendant was a "bigger guy" than Mr. Conrad. Both men are seen wearing black clothing in the Walmart security footage. There was no forensic evidence tying Defendant to the shooting. The only other evidence implicating Defendant was the fact that he was separated from Mr. Adams, Mr. Conrad, and Ms. Lovett for a portion of the evening; that it would have been easier for him to drive from the tennis courts to the Walmart in 22 minutes than it would be for the others to drive there in 9 minutes; and that he told the others something to the effect of "I hit him in the dome," though we note that Mr. Sosa was not shot in the head. After careful consideration of the facts in the record, we believe that this case is one of "those exceptional cases" described by *Reece* where the failure to give a limiting instruction amounted to "fundamental error." *See id.*; *see also Emit Keith Cody*, 2000

WL 1742698, at *5 (concluding that the admission of a prior inconsistent statement was plain error when the other evidence in the record was "vague [and] circumstantial").

Finally, there is no evidence that defense counsel's failure to object was a deliberate tactical decision. The *Smith* court found that the admission of a prior inconsistent statement was not plain error where counsel conceded that the failure to object was a tactical decision "to convince the jury that [the witness] had no credibility." 24 S.W.3d at 283-84. In this case, there was no concession that the failure to object was a tactical decision, and we can see no tactical advantage to allowing in inadmissible evidence that directly implicates Defendant. *See Emit Keith Cody*, 2000 WL 1742698, at *5. The State argues that it was a tactical decision because Defendant's theory of the case was that Ms. Lovett and Mr. Adams were not credible witnesses and that he promoted this theory through his cross-examination of Ms. Lovett and closing argument. Defendant responds that "there is evidence in the record that [Defendant's] trial counsel did have an objection to this method of impeachment and tried to make it known to the trial judge." We agree that defense counsel's suggestion to "piecemeal it," while perhaps not a proper objection, was a reference to the procedure necessary to admitting a prior inconsistent statement as impeachment evidence under Rule 613(b). *See Roderick Quatel Bates and Emmett Jones*, 2015 WL 9019818, at *12; *Foust*, 482 S.W.3d at 41. Defense counsel's suggestion also seems to be a reference to the "proper procedure" the trial court had required him to follow during his cross-examination of Mr. Adams.[17] When the trial court overruled this suggestion and allowed the entire statement to be played for the jury, we cannot fault defense counsel for attempting to minimize the damage through his cross-examination and closing argument. *See Emit Keith Cody*, 2000 WL 1742698, at *5 (finding failure to object was not a tactical decision even when defense counsel argued to the jury that "[t]he State's case rises and falls on whether you think that [the witness] gave an accurate statement to law enforcement officers or whether she lied on January the 29 because she was afraid").

Because all five factors necessary for plain error have been satisfied, we conclude that Defendant is entitled to relief and is entitled to a new trial regardless of our determination on the suppression issue. However, upon retrial, Ms. Lovett's police interview may be admissible either as impeachment evidence or as substantive evidence if the parties and the trial court follow the procedures for the admission of a prior

---

[17] On appeal, Defendant did not challenge the admission of the recording of Mr. Adams's interrogation because the parties consented to its admissibility at trial. *See Smith*, 24 S.W.3d at 279 ("A party may consent to the admissibility of evidence which is otherwise prohibited by the Rules, so long as the proceedings are not rendered for fundamentally unfair as to violate due process."). On remand, absent a similar agreement, Mr. Adams's statement would likewise be subject to Tennessee Rules of Evidence 613(b) and 803(26). "[F]or the purposes of Tennessee Rule of Evidence 803(26), a prior statement about events that a witness claims at trial to be unable to remember is 'inconsistent' with the witness'[s] trial testimony." *State v. Davis*, 466 S.W.3d 49, 64 (Tenn. 2015).

inconsistent statement under Rules 613(b) and 803(26).  Additionally, the parties may agree to the admissibility of the statement, or Defendant may make a tactical decision not to object to the admission of the statement.  *See Smith*, 24 S.W.3d at 279, 283.

*Conclusion*

Based on the foregoing, we reverse Defendant's convictions for first degree murder and attempted first degree murder due to the erroneous admission of both Defendant's statement in violation of *Miranda* and Ms. Lovett's statement under the Rules of Evidence with regard to prior inconsistent statements.  We remand the case to the trial court for a new trial.

_____
TIMOTHY L. EASTER, JUDGE